UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br>    *Plaintiff*, | )<br>)<br>) | |
| *vs.* | ) | 1:18-cr-295-JMS-TAB |
| | ) | |
| JEMAYL J. PEARSON, JR.,<br>    *Defendant.* | )<br>)<br>) | |

**ORDER ON DEFENDANT'S MOTION TO SUPPRESS**

    Presently pending before the Court is Defendant Jemayl Pearson, Jr.'s Motion to Suppress. [Filing No. 29.] Mr. Pearson has been charged with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1), [Filing No. 1], and is awaiting trial in this matter, [Filing No. 34]. He seeks to suppress: (1) evidence recovered after what he contends was an illegal search and seizure in violation of his Fourth Amendment rights, and (2) admissions and statements he made during an interrogation. For the reasons detailed herein, Mr. Pearson's Motion is **DENIED** because the Court concludes there have been no constitutional violations.

**I.**
**BACKGROUND**

    On June 12, 2018, Mr. Pearson signed a contract (the "Contract") with Marion County Community Corrections, ("MCCC") in order to participate in an electronic monitoring program. [Filing No. 29-1 at 1-4.] The Contract provided, in relevant part, as follows:

> You waive your right against search and seizure, and shall permit MCCC staff, or any law enforcement officer acting on a MCCC's behalf, to search your person, residence, motor vehicle, or any location where your personal property may be found, to insure compliance with the requirements of community corrections.

…

> You must not use, purchase or possess weapons, firearms, or ammunition. Any weapons, firearms, or ammunition found in the residence where you reside will be confiscated and will result in the immediate filing of a Notice of Violation with the Court. There are to be no weapons in the residence regardless if any residents have a valid weapon permit.

[Filing No. 29-1 at 1.]

As part of the intake process, Mr. Pearson was required to watch a video of an MCCC employee reading the Contract out loud. [Filing No. 29-2 at 1.] The wording of the Contract varied slightly from the words read in the intake video, which stated as follows:

> You must permit MCC (sic) staff and/or law enforcement to enter the residence in which you are residing and to conduct a search of the residence at any time with no prior notice. You must permit a search of your person or property by MCCC staff and/or law enforcement based on a reasonable suspicion that a violation of any part of this Contract has occurred.

[Filing No. 36, Ex. 6 at 2:01-2:24.]

In late June and early July 2018, Mr. Pearson's MCCC case manager, Doug Langille, gave Mr. Pearson two verbal warnings after evidence showed that Mr. Pearson had traveled to an unauthorized location. [Filing No. 35-1 at 2-3.] On July 10, 2018, MCCC law enforcement liaison Jill Jones requested a compliance check of Mr. Pearson's residence with the Indianapolis Metropolitan Police Department ("IMPD"), which occurred nine days later.[1] [Filing No. 35-1 at 3.]

Ms. Jones conducted the compliance check of Mr. Pearson's residence with IMPD Sergeant Richard Stratman, and Officers Christopher Chapman, Scott Nickels, and Jesus Soria. [Filing No. 29-2 at 1.] During the compliance check, Officer Soria looked underneath the couch and found a pair of sweatpants wrapped around a rifle. [Filing No. 29-2 at 2.] Officer Soria then

---

[1] Ms. Jones' affidavit identifies the date of the compliance check as "July 19, 2019." [Filing No. 35-1 at 3.] As that date has not yet occurred, the Court will assume that she intended to identify July 19, 2018 as the date of the compliance check.

placed Mr. Pearson in handcuffs and Officer Nickels began recording statements from Mr. Pearson, his mother Lakenya Pearson, and another individual who was present at the scene. [Filing No. 29-2 at 2.] Officer Nickels read Mr. Pearson his *Miranda* rights and then began questioning him. [Filing No. 29-2 at 2; Filing No. 35-4 at 1.]

In response to Officer Nickels' questions, Mr. Pearson initially stated that he did not know anything about the rifle under the couch and that it probably belonged to his mother's boyfriend. [Filing No. 35-4 at 2.] Officer Nickels then questioned Ms. Pearson, who stated that the rifle was not hers, that she did not have a boyfriend, and that the only other resident at the address was her son. [Filing No. 35-4 at 4.] Ms. Pearson eventually revealed that she had been convicted of a felony twelve years ago. [Filing No. 35-4 at 7.] Officer Nickels then said to Mr. Pearson

> So, the truth is, even if it's 12 years, mom is still in the same situation you are. . . . She's considered a felon too. You know what you're saying there? So someone, you or anybody else, brings a gun into her house, she could potentially be charged with that. You understand that, right? . . . . It doesn't matter if it's been 12 years or 30 years. Do you want to rethink what you're telling me? Are you doing the right thing? . . . Jamayl, do you want to rethink what you're telling me and do the right thing?

[Filing No. 35-4 at 7.] The questioning continued as follows (with "SN" being Officer Nickels, "JP" being Mr. Pearson, and "LP" being Ms. Pearson):

SN: I'm just, just so we're clear though, you understand the position you're putting your mother in, right? You understand that?

JP: How am I putting her in a position?

LP: Because I'm going to go to fucking jail?

SN: She's a serious. She's a serious violent felon just like you are.

LP: And lose everything I got going on.

SN: She's a serious violent felon just like you are with a dealing case conviction. That qualifies her as a serious violent felon. Any firearm in her residence, she could potentially go to prison for. You're okay with that?

JP: Nah, I ain't.

SN: So do you want to talk me about this or no? Do you want to tell me the truth or no?

[Filing No. 35-4 at 8.]

| | |
|---|---|
| JP: | What about? |
| SN: | About the gun, man. |
| JP: | I'm saying. What's the deal? |
| SN: | I'm asking you. You mom said it ain't hers. She said you and her are the only ones that live here. |
| JP: | I didn't say it was. |
| SN: | I'm telling you man up, man. You put your mom in a bad spot if you brought that gun in the house. |
| JP: | If that's the case, then it's mine then. |
| SN: | Don't tell me it's something that's a lie. Tell me the truth. |
| JP: | That's the truth. |
| SN: | It's yours? |
| JP: | Yeah. |
| SN: | Where did you get it? |
| JP: | Done talking. |
| SN: | Dude, that ain't how it works. If you're going to tell me the truth, you're going to tell me the whole truth man. How long have you had it? Is it loaded? When's the last time you touched it? Where did you get it? Have you ever shot it? These are all questions that need to be answered. |
| JP: | All I'm saying is, it's mine. That's it, nobody else knew about it. It's mine. |

[Filing No. 35-4 at 9.]

Sometime after Mr. Pearson's arrest, he made a telephone call from jail in which he discussed the firearm that had been found at his residence and revealed to the individual on the other end of the line that someone "was supposed to come and get that." [Filing No. 36, Government's Ex. 7 at 5:28.]

On September 18, 2018, Mr. Pearson was indicted for one count of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). [Filing No. 1 at 1.] On February 4,

2019, Mr. Pearson filed a Motion to Suppress, [Filing No. 29], which is now fully briefed and is ripe for the Court's review.

## II.
### DISCUSSION

By his Motion, Mr. Pearson seeks to suppress two categories of evidence, each of which the Court considers in turn.

### A. Motion to Suppress Evidence of a Firearm

Mr. Pearson first moves to "suppress the evidence (a Norinco SKS 7.62x39mm semiautomatic rifle, serial # 111228141) removed from his residence after law enforcement entered it without a search warrant and without any exception to the 4th Amendment in place." [Filing No. 29 at 1.] Mr. Pearson argues that the Court's analysis of whether a search was reasonable under the Fourth Amendment should be "shaped by the state law that governed" the terms of his parole. [Filing No. 29 at 6.] Mr. Pearson further argues that Indiana law holds that "suspicionless searches of a community-corrections participant are permissible under the Fourth Amendment to the U.S. Constitution, but only if the conditions of the program unambiguously authorize such searches." [Filing No. 29 at 8 (quoting *Jarman v. State*, 114 N.E.3d 911 (Ind. Ct. App. 2018)).] In this case, Mr. Pearson contends that language in the Contract is "vague and general" and did not include "language such as 'without suspicion,' 'without reasonable suspicion,' 'without reasonable cause,' or 'without cause.'" [Filing No. 29 at 9.] As such, he argues that the search condition was not clearly expressed, and any evidence acquired during the search should not be permitted into evidence. [Filing No. 29 at 11.]

In response, the Government argues that under "the unambiguous terms of the [C]ontract," Mr. Pearson "fully waived his rights against search and seizure at his residence." [Filing No. 35 at 6.] The Government agrees that under Indiana law "warrantless searches, even without any

particularized suspicion, are entirely lawful where conducted according to a valid and unambiguous consent or waiver." [Filing No. 35 at 7 (citing *State v. Vanderkolk*, 32 N.E.3d 775 (Ind. 2015)).] However, the Government disputes Mr. Pearson's characterization of the Contract as vague and contends that it "unambiguously subjected him to warrantless search and seizure as a condition of his community confinement." [Filing No. 35 at 8.] As evidence, the Government points out that the Contract contains no "qualifying or ambiguous language" "expressing a quantum of necessary suspicion for such search and seizure," and therefore Mr. Pearson "authorized any searches and seizures by law enforcement to insure compliance with the requirements of community corrections." [Filing No. 35 at 9-12.] The Government concedes that the orientation video contains a statement that an individual "must allow searches of his person or property upon reasonable suspicion of a violation of the terms of his community corrections contract," but argues that the Contract does not. [Filing No. 35 at 9.] Alternatively, the Government argues that even if reasonable suspicion were required prior to a search, the search was permissible because in this case there was reasonable suspicion that Mr. Pearson violated the terms of his community corrections. [Filing No. 35 at 10-13.]

In reply, Mr. Pearson reiterates his argument that Indiana law holds that a "waiver must unambiguously authorize suspicionless searches" and that "there must be a clarity to the term and condition of any contract signed so the defendant knows that searches can be suspicionless." [Filing No. 38 at 3.] Mr. Pearson refutes the Government's contention that the officer's actions in this case constituted a "safety sweep," and instead argues that the officer conducted "an out and out search." [Filing No. 38 at 5.]

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures. . . ." U.S. Const. amend.

IV. Generally, a warrantless search or seizure in the absence of probable cause is unreasonable. *United States v. Slone*, 636 F.3d 845, 848-49 (7th Cir. 2011). When police conduct an unreasonable search or seizure, the exclusionary rule usually vindicates the Fourth Amendment's protections by keeping out the unlawfully obtained evidence. *Id.*

A threshold question is whether the actions that led to the discovery of the firearm qualify as a sweep that is allowed under the Fourth Amendment. The Court concludes that they do not. The Government uses the term "safety sweep" in their brief, [Filing No. 35 at 9 (in which the Government states that "law enforcement simply entered Defendant's residence and conducted a safety sweep to ensure that dangerous contraband was not present while officers were in the residence")], while Mr. Pearson refutes this characterization and contends that a search took place, [Filing No. 38 at 5 (in which Mr. Pearson states that what the Government describes as "a safety sweep is an out and out search")]. However, the Government has provided no authority supporting its characterization of this "safety sweep," and Seventh Circuit case law does support the conclusion that a safety sweep is permitted under the Fourth Amendment under the facts of this case.

By contrast, there is ample case law describing a "protective sweep," which is permitted under the Fourth Amendment in limited circumstances. In 1990, the Supreme Court defined a "protective sweep" as "a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others" that is "narrowly confined to a cursory visual inspection of those places in which a person might be hiding." *Maryland v. Buie*, 494 U.S. 325, 327 (1990). The Seventh Circuit echoed this narrow definition, holding that when "officers enter the residence of a criminal suspect and have reason to believe that a particular area might harbor an individual. . . who poses a danger to the officers or others, the Fourth Amendment permits a quick and limited protective sweep." *United States v. Starnes*, 741 F.3d 804, 810 (7th Cir. 2013).

Courts typically analyze the scope of a protective sweep based on whether an individual could be hiding in the area searched. *See, e.g., Kirkwood v. DeLong*, 683 F. Supp. 2d 823, 832 (N.D. Ind. 2010) (holding that "opening drawers, searching in a couch, and opening birthday presents would not fall into [the] limited scope" of a protective sweep); *see also United States v. Waters*, 883 F.3d 1022, 1025 (8th Cir. 2017) (ruling that a deputy U.S. Marshal's actions in "pushing one side of the couch away from the wall to see if anyone was hiding behind or inside it" was a protective sweep because the couch could have harbored a dangerous individual); *United States v. Tucker*, 166 F.3d 1223 (10th Cir. 1999) (upholding a district court's holding that under a protective sweep, officers were entitled to "look in a closet or open a bathroom door or look behind a bulky piece of furniture"). Courts outside the Seventh Circuit have explicitly held that protective sweeps are not permitted for weapons or contraband, *United States v. Waldner*, 425 F.3d 514, 517 (8th Cir. 2005), and the Seventh Circuit has cautioned that its caselaw should "neither expand nor contract" law enforcement's right to perform a protective sweep as enunciated in *Maryland v. Buie*. *United States v. Henderson*, 748 F.3d 788, 791 (7th Cir. 2014). In this case, there is no contention by either party that Officer Soria looked underneath the couch at Mr. Pearson's residence in order to search for a person. [Filing No. 35-3 at 1.] Accordingly, the Court concludes that the actions that led to the discovery of the firearm in this case do not constitute a protective sweep.

In this case, the parties agree that under *United States v. White*, 781 F.3d 858 (7th Cir. 2015), in order to conduct an analysis under the Fourth Amendment, the Court must determine Mr. Pearson's legitimate expectations of privacy, and, in doing so, the Court's analysis is shaped by the state law that governed Mr. Pearson's terms of supervision. However, the parties disagree as to how Indiana law applies to this case. The Government cites the Indiana Supreme Court's opinion in *State v. Vanderkolk*, 32 N.E.3d 775 (Ind. 2015), whereas Mr. Pearson primarily relies

upon *Jarman v. State*, 114 N.E.3d 911 (Ind. Ct. App. 2018). The Court examines each case, in turn.

In *Vanderkolk*, officers searched the home of a community corrections participant who had agreed that under the terms of the program, an officer could enter his "residence at any time without prior notice to search upon probable cause." 32 N.E.3d at 778. The officers who searched the residence had "no suspicion of illegal activity" before undertaking the search. *Id*. at 776. The Indiana Supreme Court began by rejecting the State's contention that an individual's "status as a community corrections participant, standing alone, operated to authorize the warrantless and suspicionless compliance search . . . ." *Id*. at 777-78. Next, the Court examined whether the search had been authorized by consent by looking at the language in the community corrections home detention participant handbook. *Id*. at 778. The Court found that the language of the waiver "conditioned [an individual's] search consent upon the existence of probable cause." *Id*. at 778. In addition, the Indiana Supreme Court cited *United States v. Knights*, 534 U.S. 112 (2001), in which the United States Supreme Court looked at the language in a probation order and considered it significant "that the probation order 'clearly expressed the search condition' and 'unambiguously informed [the defendant] of it.'" *Vanderkolk*, 32 N.E.3d at 778 (quoting *Knights*, 534 U.S. at 119). Applying *Knights* to the case before it, the Indiana Supreme Court concluded that "[i]n the present case, the search condition was not clearly expressed and the defendant was not unambiguously informed" and that the "defendant consented only to searches upon probable cause, not to the type of search conducted in the present case." *Id*. at 778. As such, the Court held that the searches in question were unlawful under the Fourth Amendment. *Id*. at 778.

Three years later, in *Jarman*, the Indiana Court of Appeals considered the case of an individual who was on community corrections and had signed an agreement allowing law

enforcement officers to search his "person or property without a warrant and without probable cause." *Jarman*, 114 N.E.3d at 913, *transfer denied*, 2019 WL 949417 (Ind. Feb. 21, 2019). The state argued that with this language, "Jarman waived all Fourth Amendment rights and consented to suspicionless searches." *Id*. at 914. However, the Court found that "the statement 'I agree to a search without probable cause' does not unambiguously mean 'I agree to a search without reasonable suspicion.'" *Id*. at 915. The Court added the following: "If the State wanted Jarman to be subject to suspicionless searches as a condition of entering community corrections, it should have included in its waiver form language like 'without suspicion,' 'without reasonable suspicion,' 'without reasonable cause,' or 'without cause.' Because the waiver did not include any such language, we reverse." *Id*. at 915.

The Contract Mr. Pearson signed contained a waiver that does not fit neatly into the waiver language in either *Vanderkolk* or *Jarman*. Mr. Pearson's Contract provides as follows:

> You waive your right against search and seizure, and shall permit MCCC staff, or any law enforcement officer acting on a MCCC's behalf, to search your person, residence, motor vehicle, or any location where your personal property may be found, to insure compliance with the requirements of community corrections.

[Filing No. 29-1 at 1.] Unlike the language present in *Vanderkolk*, the Contract does not condition any search upon the existence of probable cause. And unlike the language present in *Jarman*, the Contract does not require the participant to agree to a search without probable cause. The Contract simply waives a participant's "right against search and seizure" and contains no qualifying language specifying the level of suspicion required, if any. The only limiter found in the Contract is that the purpose of the search must be "to insure compliance with the requirements of community corrections." In this case, there is no dispute that the purpose of the home visit was to insure compliance with the requirements of community corrections as set forth in the Contract. [Filing

No. 29 at 2 (in which Mr. Pearson cites the probable cause affidavit, stating that the purpose of the visit was to insure that Mr. Pearson was "in compliance.")]

Mr. Pearson correctly points out that the Contract does not contain "language like 'without suspicion,' 'without reasonable suspicion,' 'without reasonable cause,' or 'without cause,'" – the type of language the Indiana Court of Appeals found "should" be included in a waiver in order to subject a participant to suspicionless searches. *Jarman*, 114 N.E.3d at 915. But this portion of *Jarman* is not determinative in this case for two related reasons. First, the Court concludes that the Court of Appeals' listing of possible language to be included in a waiver is dicta. *See In re Adoption of J.T.D.*, 21 N.E.3d 824, 830 (Ind. 2014) (quoting *Koske v. Townsend Eng'g Co.*, 551 N.E.2d 437, 443 (Ind. 1990)) ("[S]tatements not necessary in the determination of the issues presented are *obiter dictum*. They are not binding and do not become the law"). Second, and relatedly, this portion of *Jarman* cannot be read in isolation. Rather, it comes at the end of an opinion in which the Indiana Court of Appeals had already held that the language included in the waiver did not "unambiguously" subject a participant to a search without reasonable suspicion, but only to a search without probable cause. Here, there is no such ambiguity in the Contract – a participant waives his or her right against search and seizure to insure compliance with the requirements of community corrections. Not only is this language clear, it is clearer than the language suggested by *Jarman* in that it avoids legalese and is not technical. It is – in short – the kind of language that a lay person could understand without knowing the legal significance of terms of art such as "probable cause" or "reasonable suspicion." As such, the Court concludes that

this language clearly expressed the search condition and unambiguously informed Mr. Pearson that he had waived his right against search and seizure.[2]

As a result of the forgoing, Mr. Pearson's motion to "suppress the evidence (a Norinco SKS 7.62x39mm semiautomatic rifle, serial # 111228141) removed from his residence," [Filing No. 29 at 1], is **DENIED**.

### B. Motion to Suppress Evidence of Statements and Admissions

Mr. Pearson next argues that the "technique used by the officer in the apartment to focus on [Mr.] Pearson's mother's prior felony and her ability to now be arrested for the rifle found in her apartment was a classic example of psychological threats to induce [Mr.] Pearson's confession." [Filing No. 29 at 10.] As a result, Mr. Pearson argues that his "confession was not voluntary within the meaning of the due process clause" and his confession is therefore inadmissible. [Filing No. 29 at 10-11.]

---

[2] The Court notes that the analysis herein pertains only to the Contract. The parties also discuss an orientation video that Mr. Pearson watched at or around the time he signed the Contract. The Government concedes that the video contains slightly different language than the Contract by providing that "Defendant must allow searches of his person or property upon reasonable suspicion of a violation of the terms of his community corrections contract," but contends that the Contract contains no such qualifying language and, in any case, the search in this case was consistent with the terms set forth in the video. [Filing No. 35 at 9.] In reply, Mr. Pearson argues that the terms of the Contract govern. [Filing No. 38 at 3 ("Oral statements should not and cannot control in a situation such as this where constitutional rights are in play and a written document is utilized . . . . the Community Corrections Contract was drafted by Community Corrections or its agents, and they are presumed to state correctly all the terms intended, and any drafting 'errors' are held against the drafter").] As a result, the Court finds that Mr. Pearson has waived any argument that the terms of the video constitute the applicable waiver in this case.

Even assuming *arguendo* that Mr. Pearson had made such an argument, the Court finds that the Government met its burden of showing that it had reasonable suspicion that Mr. Pearson had violated the terms of the Contract by providing the declaration of Ms. Jones, who stated that she conducted the home visit because she had evidence that Mr. Pearson was traveling to unauthorized locations. [Filing No. 35-1 at 3.]

In response, the Government contends that Mr. Pearson's confession was voluntary. [Filing No. 35 at 14.] The Government points out that Mr. Pearson's interview with the police was of a short duration, he was not deprived of food, water, or sleep, he was not under the influence of alcohol or drugs, and he had no mental or emotional shortcoming affecting his ability to act rationally. [Filing No. 35 at 15.] The Government further contends that Mr. Pearson's argument that Officer Nickels' comments about Mr. Pearson's mother were coercive is "frivolous" because Officer Nickels was telling Mr. Pearson the truth about his mother's status as a felon. [Filing No. 35 at 15-17.] In addition, the Government argues that "two additional circumstances shed considerable doubt" on Mr. Pearson's "claim that he had been coerced into confessing to save his mother." [Filing No. 35 at 19.] First, the Government contends that Mr. Pearson's interactions with his mother appear "strained at best," and second, in a phone call he made from jail, Mr. Pearson expressed regret that he had failed to move the firearm to another room. [Filing No. 35 at 19-20.]

In his reply brief, Mr. Pearson reiterates his argument that Officer Nickels' questioning was coercive, particularly his comment that Mr. Pearson needed to "man up" and his characterization that Mr. Pearson had "put his mom in a bad spot." [Filing No. 38 at 6.] Mr. Pearson further contends that the Government's arguments about the relationship between Mr. Pearson and his mother and his phone call from jail lack "connectivity to the argument." [Filing No. 38 at 6.] Mr. Pearson further argues that he was handcuffed when interrogation began and was "surrounded in the apartment by five law enforcement personnel, and all his family members have been placed in the same room with him," providing additional "psychological coercion." [Filing No. 38 at 7.]

"A confession is involuntary if it is the result of coercive police conduct." *United States v. Montgomery*, 555 F.3d 623, 629 (7th Cir. 2009). The test for a voluntary confession is "whether the defendant's will was overborne at the time he confessed." *United States v. Hocking*, 860 F.2d 769, 774 (7th Cir. 1988) (quoting *Lynumn v. State of Illinois*, 372 U.S. 528, 534 (1963)). "In deciding whether a confession was voluntary, courts assess 'the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation.'" *Dassey v. Dittmann*, 877 F.3d 297, 303 (7th Cir. 2017) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)). The Seventh Circuit has set forth the following factors to be considered when evaluating coercion: a defendant's "age, education, intelligence level, and mental state; the length of the defendant's detention; the nature of the interrogations; the inclusion of advice about constitutional rights; and the use of physical punishment, including deprivation of food or sleep. Narcotics, alcohol, and fatigue also may be considerations in a particular case." *United States v. Vallar*, 635 F.3d 271, 282 (7th Cir. 2011) (quotations and citations omitted). Overall, the Court must determine whether the circumstances surrounding Mr. Pearson's confession "would have interfered with his free and deliberate choice of whether to confess." *Johnson v. Pollard*, 559 F.3d 746, 753 (7th Cir. 2009) (citation and quotation omitted). However, the police "are allowed to play on a suspect's ignorance, his anxieties, his fears, and his uncertainties; they just are not allowed to magnify those fears, uncertainties, and so forth to the point where rational decision becomes impossible." *Dassey*, 877 F.3d at 316, *cert. denied*, 138 S. Ct. 2677 (2018) (quoting *United States v. Rutledge*, 900 F.2d 1127, 1130 (7th Cir. 1990)).

The Seventh Circuit has stated that "it is clearly established that police threats against the suspect or the suspect's family are a form of psychological coercion that renders a confession involuntary." *Hurt v. Wise*, 880 F.3d 831, 846 (7th Cir. 2018), *overruled on other grounds by*

*Lewis v. City of Chicago*, 914 F.3d 472 (7th Cir. 2019); *see also Sornberger v. City of Knoxville, Ill.*, 434 F.3d 1006, 1023 (7th Cir. 2006) ("[t]hreats to a suspect's family or children, even if implicit, certainly may render confessions involuntary for purposes of due process"). At first blush, this statement from *Hurt* appears to support Mr. Pearson's argument that Officer Nickels' "focus on [Mr.] Pearson's mother's prior felony and her ability to now be arrested for the rifle found in her apartment was a classic example of psychological threats to induce [Mr.] Pearson's confession." [Filing No. 29 at 10.] However, the Court disagrees and finds that Officer Nickels' statements to Mr. Pearson are distinguishable from the threats present in *Hurt*.[3] Under the facts before the court in *Hurt*, the suspect was told that "she was going to spend 25–50 years behind bars," that she was "going to hang" if she did not tell the truth, and that "if she did not talk, her whole family, including her uninvolved mother, would go to jail." *Hurt*, 880 F.3d at 846. The Court of Appeals classified such comments as "grave threats." *Id*. at 846. By contrast, Officer Nickels asked Mr. Pearson if he understood the position he was putting his mother in, explained that she could "potentially go to prison" for having any firearm in her residence, said Mr. Pearson should "man up" and that he put his mom "in a bad spot" if he brought the gun into the house. [Filing No. 35-4 at 8-9]. Rather than threats that would render Mr. Pearson's confession involuntary, such comments presented an accurate picture of the legal situation Mr. Pearson's mother was in at the time the firearm was found. This is analogous to the situation described in *United States v. Rodgers*, in which the District Court for the Eastern District of Wisconsin stated that "a police officer's suggestion of possible adverse consequences to a suspect's friend or loved one is not always improper," and that sometimes "such a suggestion may be an honest statement

---

[3] The Court also notes that *Hurt* is further distinguishable from this case because it dealt with the denial of qualified immunity to state police officers in a civil case under 42 U.S.C. § 1983 rather than a motion to suppress in a criminal case.

of a possible outcome." 186 F. Supp. 2d 971, 976 (E.D. Wis. 2002). The Court in *Rodgers* went on to set forth a hypothetical scenario that mirrors the facts of this case:

> If, for example, police find drugs in a common area of a home shared by a husband and wife, and, in the absence of an admission from one spouse, could properly seek charges against both, it would be entirely proper for police to disclose this information during an interrogation.

*Id*. at 976. Similarly, in this case, the Court finds that it was proper for Officer Nickels to make statements to Mr. Pearson about his mother's legal status during the interrogation and that such statements were not coercive.

In addition, the Court finds that Officer Nickel's statements to Mr. Pearson were not coercive because there is no dispute that Officer Nickels had probable cause to arrest Mr. Pearson's mother. This is significant because courts in other circuits have found that whether "a threat to prosecute a third party is coercive turns on the issue of whether the threat could have been lawfully executed." *United States v. Hunter*, 332 F. App'x 285, 289 (6th Cir. 2009) (citations and quotations omitted). *See also United States v. Hufstetler*, 782 F.3d 19, 24 (1st Cir. 2015) ("an officer's truthful description of the family member's predicament is permissible since it merely constitutes an attempt to both accurately depict the situation to the suspect and to elicit more information about the family member's culpability"); *States v. Hall*, 711 F. App'x 198, 202 (5th Cir. 2017) (holding that any "implicit threats to continue investigating" the suspect's girlfriend "were constitutionally permissible given her likely involvement in the crime" and that invoking the girlfriend's name in this way "was not enough to render" the suspect's "subsequent statements involuntary"); *United States v. Williams*, 141 F.3d 1186 (10th Cir. 1998) (finding that even if a suspect's "confession was motivated by a desire to spare his girlfriend from an investigation and its possible consequences, such motivation does not render the confession involuntary"); *United States v. Murray*, 659 F. App'x 1023, 1027 (11th Cir. 2016) ("an officer's statement that a

suspect's friend or family member will be arrested unless he confesses is not coercive so long as—when the officer spoke—the officer had probable cause to effect the threatened arrest); *United States v. Ortiz*, 943 F. Supp. 2d 447, 456 (S.D.N.Y. 2013) (holding that a confession is not rendered involuntary "if the police have probable cause to arrest the family member and thus could lawfully carry out the threat"). Along with ample authority from other circuits concerning threats to arrest family members and loved ones, the Seventh Circuit's decision in *United States v. Westbrook* is helpful to this case. 125 F.3d 996 (7th Cir. 1997). In *Westbrook* an agent presented a suspect "with the reality that his wife had marijuana in her purse and made him an offer: If he would cooperate by helping the police find [another suspect], that cooperation would be helpful" because "the state prosecutor would take it into consideration when evaluating [his wife's] case." *Id*. at 1006. The suspect argued that his written statement was coerced by the agent's conduct. *Id*. at 1004. The Seventh Circuit disagreed and opined that this technique did not place "undue psychological coercion" on the suspect "by suggesting that it would be to his wife's benefit, rather than (or as well as) to his own benefit, to cooperate." *Id*. at 1006. The court found it significant that the agent "did not misrepresent the Government's intention or purpose." *Id*. at 1006. Similarly, in this case there is no dispute that Officer Nickels' comments to Mr. Pearson regarding his mother and the legal situation she faced were accurate, and that there existed probable cause for Officer Nickels to arrest Mr. Pearson's mother due to the firearm in her residence. As such, Officer Nickels' informing Mr. Pearson of this fact was not coercive.

Based upon the foregoing, the Court concludes that Mr. Pearson's Motion to Suppress statements made during Officer Nickels' interrogation should be denied. However, the Court will briefly address the Government's argument that "circumstances shed considerable doubt on Defendant's claim that he had been coerced into confessing to save his mother," because of the

appearance of a strained relationship between the two and because Mr. Pearson did not reveal any such coercion during a phone call he made from jail. [Filing No. 35 at 19.] The first aspect of this argument essentially asks the Court to conclude that Mr. Pearson's confession was true because he lacked a motive to cover for his mother. However, it is impermissible for the Court to consider the truth of Mr. Pearson's confession in analyzing whether it is admissible under the standards of coercion the Court has previously set forth. *See Rogers v. Richmond*, 365 U.S. 534, 544 (1961) (holding that a trial court must focus "on the question whether the behavior of the State's law enforcement officials was such as to overbear petitioner's will to resist and bring about confessions not freely self-determined—a question to be answered with complete disregard of whether or not petitioner in fact spoke the truth"). Accordingly, the relationship between Mr. Pearson and his mother has no bearing on this Court's decision. Secondly, Mr. Pearson's failure to corroborate his argument about coercion during the phone call he made from jail is also outside of the factors that this Court can or did consider in finding that there was no coercion in this case.[4] Instead, the Court's finding on this point is that circumstances surrounding Mr. Pearson's confession did not interfere with his free and deliberate choice of whether to confess.

As such, Mr. Pearson's motion to suppress evidence of his confession is **DENIED**.

---

[4] Although not raised by the parties, the Court does find significant the fact that Mr. Pearson stated in the telephone call he made from jail that someone was supposed to come and get the firearm. Even assuming *arguendo* that Mr. Pearson's initial confession had been coerced, Mr. Pearson's statements during the phone call may well be enough to constitute a confession in and of themselves. A remaining question would be whether such a confession would be purged of the taint of the illegal arrest given the significant temporal proximity between Mr. Pearson's arrest and the telephone phone call. *See Taylor v. Alabama*, 457 U.S. 687, 690 (1982). However, the Court need not consider this issue, as it was not raised by the parties.

## III.
### CONCLUSION

For the reasons detailed herein, the Court **DENIES** Mr. Pearson's Motion to Suppress. [29.]

Date: 4/1/2019

*Jane Magnus-Stinson*
Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana

**Distribution via ECF to all counsel of record.**